WISE, Presiding Judge.
The appellant, Thomas Douglas Arthur, was convicted of capital murder and sentenced to death for the killing of Troy Wicker. The murder was made capital because he had been convicted of another murder in the twenty years preceding the crime. See § 13A-5-40(a)(13), Ala.Code 1975. After the Alabama Supreme Court reversed this court’s judgment affirming that conviction, see Ex parte Arthur, 472 So.2d 665 (Ala.1985), Arthur was again convicted of capital murder and sentenced to death. That second conviction also was reversed, see Arthur v. State, 575 So.2d 1165 (Ala.Crim.App.1990), and he was convicted of capital murder and sentenced to death a third time. This court affirmed Arthur’s conviction and sentence, see Ar *736 thur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), and the Alabama Supreme Coui't affirmed his conviction and sentence, see Ex parte Arthur, 711 So.2d 1097 (Ala.1997). Since that time, Arthur has filed several post-conviction petitions. This appeal follows the denial of one of those petitions.
In Ex parte Arthur, 711 So.2d 1097, 1098 (Ala.1997), the Alabama Supreme Court summarized some of the facts of the case as follows:
“More than 20 years ago, Arthur’s relationship with his common-law wife ultimately led to his brutally murdering a relative of the woman. Arthur shot the victim in the right eye with a pistol, causing nearly instant death. He was convicted in a 1977 trial and was sentenced to life imprisonment.
“While on work release during the life sentence, Arthur had an affair with a woman that ultimately led to his brutally murdering that woman’s husband, Troy Wicker, in 1982. Arthur shot Wicker in the right eye with a pistol, causing nearly instant death.”
The trial court also set forth the following summary of the evidence in its sentencing order:
“State’s case:
“Thirteen witnesses testified for the state, the state’s case being bottomed on the testimony of accomplice Judy Wicker, Wicker having been indicted and convicted by a jury verdict for the intentional murder of her husband, Troy Wicker.
“Wicker’s conviction and life sentence were affirmed in May, 1983 at Mary Jewel Wicker v. State, 433 So.2d 1190. Wicker was in state custody when she testified on Wednesday of the trial week.
“Proceeding Wicker’s testimony:
“Eddie Lang, sergeant with Muscle Shoals Police Department, testified about observations of Ms. Wicker’s movements on the morning of the killing, February 1, 1982, and his observations of the house where the deceased was murdered;
“Joseph Gary Wallace of the Department of Forensic Sciences, lab director in Florence in 1982, testified about his observations at the scene, the gathering and transfer of physical items from a certain Buick Riviera vehicle;
“Brent Wheeler and John Kilboume of the Huntsville forensic lab testified about lab procedure;
“Joel Reagan, who ran a mobile home sales lot testified about the defendant’s employment at his place of business;
“Talmadge Sterling, correctional officer at the Decatur Work Release Center, testified about defendant’s residency at the center as did Pat Holliday, employed at the center, who testified about a discrepancy in the defendant’s payroll records;
“Pat Yarbrough Green, who testified that she became acquainted with defendant at Cher’s Lounge (Ms. Green was employed at Cher’s Lounge in ‘parole’ status, having suffered several felony convictions); that defendant wanted to talk privately at the lounge; that in the kitchen he asked the witness, ‘Can you get me some bullets? Has to be .22 caliber mini mag long rifles.’ [sic]; that she enlisted the services of a third person to go across the street to buy the bullets; that the defendant gave her $10.00 for the bullets; that while waiting on the delivery of the bullets the defendant stated, ‘Someone will be killed in Tennessee. Don’t worry, it won’t be traced to us.’ [sic]; also, that defendant asked witness if she had access to ‘jars’ or knockout pills and asked if she knew where defendant could get some jars/ pills; that she gave the .22 bullets to the defendant;
*737 “Debra Lynn Phillips Tynes, manager of Cher’s Lounge and defendant’s paramour, states that on the day of the killing the defendant was late for a lunch date, that ultimately defendant and she went for a car ride across the Tennessee River Bridge; that defendant stopped the car and threw into the river a ‘plain black garbage bag’ wrapped in a sheet, stating that T want to get rid of some old memories’;
“Dr. Pirl, toxicologist, stated that there was no ethanol in the deceased’s body nor could he detect any narcotics;
“Dr. Aquilar testified as to cause of death; that deceased was shot at close range through the closed right eye;
“James Otis Garrard, clerk of the circuit court of Marion County testified re[garding] Court Exhibit # 40, court documentation reflective of defendant’s prior conviction for second [degree] murder;
“Judy Wicker, who at the time of her testimony in the latest trial resided at a work release center in Wetumpka, serving a life sentence as accomplice to her husband’s murder, stated that she lived in Muscle Shoals in 1982 with her husband, their two sons, ages five and seven, and a daughter by a prior marriage; that Troy, her husband, worked on a barge as an engineer; that her marriage(s) to Troy had been marked by intermittent discord; that Troy and her sister, Teresa, did not get along; that Teresa’s boyfriend was Theron McKinney; that she met Arthur when they were young and worked with him at Tidwell Homes; that she and Teresa discussed killing Troy in early 1981; that several conversations occurred between she and Teresa re[garding] killing Troy; that there was $90,000 worth of life insurance on Troy’s life; that the defendant Arthur called her by phone and stated ‘I’m hired to do a job — kill your husband’; that about one week after the phone call she and Arthur met at Arthur’s father’s house or at Reagan’s Mobile Homes; that there were sexual encounters between she and Arthur; that she knew the day of February 1 that this was the day her husband was to be killed; that the night preceding the killing she, her husband and Teresa had a drinking party at the Wicker home; that she dropped the children at school on February 1, met ... her sister, finally getting together with Teresa ‘out by the airport’; that Teresa was driving a Riviera; that defendant was with her, ‘made up’ to look like a black man — face blackened, wearing an Afro wig and gloves; that Arthur got out of Teresa’s car and into her car; that she smelled alcohol on his breath; that he had a pistol plus a garbage bag; that en route to the Wicker home she asked Arthur not to ‘do it,’ ‘I’ll give you money or whatever’; that Arthur stated ‘The SOB deserves to die’; that she had left her husband in bed asleep; that upon entering the house defendant began destroying things. ‘We went to the bedroom, I ran but I heard the shot. I ran to the utility room — ’; further, that she ended up in the den, receiving a blow to the head ‘battering my head badly, knocking out some teeth, upper lip cut into my nose. I didn’t have an upper lip.’ [sic]; that previously it had been established that she was to say that her and Troy’s home was burglarized and she was assaulted by a black man; the first persons she saw on regaining consciousness were her sister and a detective; that after the killing she and Arthur continued to talk, go places together; that upon receipt of the insurance money witness paid Arthur $10,000, paid her sister, Teresa, $6,000 and Theron McKinney received some jewelry and a Trans Am automobile.
*738 “Witness Wicker was thoroughly cross-examined by [defense counsel] as to the prior contradictory statements she made to the police and under oath at her trial, as to what she expected to gain from testifying.
“The defense case featured four witnesses:
“Officer Coan, a scene witness;
“Bruce Carrol, an inmate at St. Clair prison who stated he lost $6,500 to the defendant in a poker game;
“Ronald Spears, an inmate at West Jefferson prison who stated that Patsy Yarbrough Green had previously stated to him ‘The cops told me to lie on Tommy refgarding] the .22 bullets’;
“Gene Moon, residing in Cullman County Jail, stated that ‘Inmate Murry gave me an envelope with $2,000 in it and I put it in Tommy’s coat,’ thus accounting for the defendant’s possession of an inordinate amount of currency at the work release center.
“The defendant did not testify.”
(C.R. 22-26.)
Arthur was scheduled to be executed on July 31, 2008. On July 18, 2008, he filed a “Motion for Access to DNA Evidence Before July 31, 2008, Execution” in the Alabama Supreme Court, and the Alabama Supreme Court denied that motion on July 29, 2008. On July 29, 2008, Arthur filed an “Emergency Successive Petition for Relief from Conviction Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure” and an “Emergency Motion for Stay of Execution and Access to DNA Evidence Based on Newly Discovered Facts That Completely Exonerate Thomas D. Arthur” in the circuit court. He based his filings on an affidavit in which Bobby Ray Gilbert confessed to murdering the victim. On July 29, 2008, he also filed a “Motion to Stay Execution to Permit Rule 32 Litigation” in the Alabama Supreme Court. On July 30, 2008, the Alabama Supreme Court granted the motion for a stay and stayed Arthur’s execution “pending further orders of this Court.” Subsequently, the State filed an application for a rehearing and a renewed motion to set an execution date. The Alabama Supreme Court denied those motions and noted that Arthur’s Rule 32 petition was still pending in the circuit court.
Thereafter, the circuit court conducted evidentiary hearings regarding Arthur’s Rule 32 petition and ordered some DNA testing. Afterward, it entered an order in which it thoroughly addressed each of Arthur’s claims. In its order denying the petition, the circuit court set forth the following procedural history and overview of its findings:
“Having thoroughly reviewed and considered Petitioner Thomas D. Arthur’s amended successive Rule 32 petition, the evidence presented during the evidentia-ry hearing concerning his petition conducted on April 14-15, 2009, and on August 10, 2009, the transcript records of Arthur’s capital murder trials, the transcript of Judy Wicker’s murder trial, the record on direct appeal, the forensic reports provided to this Court by the Alabama Department of Forensic Sciences, the arguments of counsel throughout these proceedings and all of the pleadings filed in the above-styled cause, this Court makes the following findings of fact and conclusions of law and hereby DENIES all relief on Arthur’s amended successive Rule 32 petition.

“PROCEDURAL HISTORY

“On July 29, 2008, Arthur filed a successive Rule 32 petition alleging that he is innocent of the capital murder of Troy Wicker. In his Rule 32 petition, Arthur alleged that newly discovered facts — a signed and notarized confession from *739 Bobby Ray Gilbert, asserting that Gilbert, not Arthur, is the killer of Troy Wicker — entitles him to relief from his conviction and sentence under Rule 32.1(e). The State of Alabama moved to dismiss Arthur’s successive Rule 32 petition on July 30, 2008, arguing that Arthur’s eleventh-hour presentation of Gilbert’s affidavit was both a fabrication and patently incredible. On July 30, 2008, the Alabama Supreme Court issued an order staying Arthur’s execution scheduled for July 31, 2008, to allow this Court to consider the allegations raised in Arthur’s successive Rule 32 petition, namely Gilbert’s affidavit in which he purported to confess to the killing of Troy Wicker.
“On January 28, 2009, Arthur filed an amended successive Rule 32 petition in which he re-asserted his claim that the newly discovered evidence of Gilbert’s affidavit required his conviction and sentence to be vacated. Arthur also alleged an additional claim that he was entitled to relief based on newly discovered evidence that the rape kit performed on Judy Wicker after the murder of Troy Wicker could not be located. Finally, Arthur contended that this Court should grant access to the physical evidence in this case — including the rape kit, wig, bloody clothing, and hairs — for DNA testing that could demonstrate his innocence based on the two claims of newly discovered evidence. (Pet. at 23)
“On April 14-15, 2009, this Court held an evidentiary hearing concerning the claims in Arthur’s amended successive Rule 32 petition. Arthur presented the testimony of Gilbert; two inmates, Charles Hastings and Steve Murphy; and Dr. Norah Rudin, a forensic scientist. The State then presented the testimony of three inmates, Curtis Henderson, Brian Barnes, and Jeffrey Holmes; five employees of the Department of Corrections, Jessie Bishop, Stephanie Atchison, Carolyn O’Brian, Gwendolyn Threatt, and Richard Carter; retired police officers Doug Aycock and Robert Hall; Bill Summers, an investigator with the Office of Attorney General; Judy Wicker; and Angelo Delia Manna, chief of forensic biology and D.N.A. for the Alabama Department of Forensic Sciences.
“During the hearing, the State presented extensive evidence, particularly through the testimony of its inmate witnesses, which clearly indicated that the affidavit of Gilbert was prepared with Arthur’s assistance. The State offered evidence that Arthur arranged for numerous notes to be transported and delivered to Gilbert while both were incarcerated in Holman Prison. Through these notes, Arthur was able to feed Gilbert facts about the murder of Troy Wicker to enable Gilbert to have information to create his affidavit.
“Although this Court found great credibility with the State’s witnesses, out of an abundance of caution, this Court stayed a final ruling and continued the evidentiary hearing until such time as the Alabama Department of Forensic Sciences could conduct D.N.A. testing on the available physical evidence in this case, specifically the wig, Judy Wicker’s panties (exhibit 17), blouse (exhibit 18) and jeans (exhibit 19) which were collected by Gary Wallace, Ala. Dept. Forensic Sciences, from the den floor where Judy was lying when the police first entered the home, as well as hair samples collected from the crime scene. (R. at Arthur trial 365, 66) This court noted at the conclusion of the testimony that although this court did not find Mr. Gilbert to be a credible witness, DNA analysis could certainly assist the Court in its final assessment of his credibility. Scientific testing was ordered on this very narrow issue of Mr. Gilbert’s *740 credibility and therefore, was not contrary to the Alabama Supreme Court’s opinion or Federal District decisions affirmed by the Eleventh Circuit, where Arthur’s request for DNA analysis has been denied. (Ex parte Thomas Douglas Arthur, CC-87-577, Appeal No. 1951985, Order Denying Motion (Ala. July 29th, 2008); Arthur v. Haley, Mem. Op., No. 01-N-0983 at p. 5 (N.D. Ala. June 4, 2008) (unpublished memorandum opinion). Arthur v. King, 07-CV-319-WKW (M.D.Ala. Aug. 17, 2007) (unpublished memorandum opinion), affirmed, Arthur v. King, 500 F.3rd [F.3d] 1335 (11th Cir.2007).
“The Alabama Department of Forensic Sciences issued its report on the examination of this biological evidence on July 9, 2009. A final evidentiary hearing was held on August 10, 2009. During this hearing, Angelo Delia Manna was re-called to testify concerning his examination of the physical evidence in this case for D.N.A. Arthur also presented testimony from a forensic expert, Keith Inman.
“After concluding the evidentiary hearing, this Court issued an oral ruling denying all relief on Arthur’s amended successive Rule 32 petition and now issues this final written order concerning the same.

“ARTHUR IS NOT ENTITLED TO RELIEF ON ANY CLAIM RAISED IN HIS AMENDED SUCCESSIVE RULE 32 PETITION

“Although Arthur has raised three claims in his amended successive Rule 32 petition, the issue before this Court is a narrow one and essentially concerns one sole issue: the credibility of Bobby Ray Gilbert’s affidavit. Arthur contends that his conviction and sentence should be vacated based on newly discovered evidence that he did not commit the crime in question. The only ‘newly discovered evidence’ supporting Arthur’s claim is Gilbert’s affidavit, although Arthur argues D.N.A. testing will support Gilbert’s affidavit.
“This Court has carefully considered the testimony presented during the evi-dentiary hearing and spent countless hours examining the transcripts of Arthur’s previous trials and finds Gilbert’s affidavit to be contrary to the great weight of evidence presented against Mr. Arthur at trial and at the Rule 32 evidentiary hearing. In short this Court finds the affidavit to be false. Consequently, Arthur’s claim that his conviction and sentence should be vacated lacks merit.
“This Court agrees with the State that, on its face, Gilbert’s affidavit is incredible. In this Court’s experience, it is an extraordinarily rare case — if ever — for a person to come forward on the eve of an execution and claim credit for a capital murder. In fact, as the United States Supreme Court has stated in Herrera v. Collins, we observe that exculpatory affidavits ‘produced at the eleventh hour with no reasonable explanation for the nearly decade-long delay’ are ‘suspect.’ 506 U.S. 390, 423 (1993).
“In this case Mr. Gilbert has waited well over two decades to come forward. Still, this Court provided Arthur a full and fair evidentiary hearing in which to present evidence supporting Gilbert’s claim that he murdered Troy Wicker.
“However, the overwhelming evidence and testimony presented before this Court established that Gilbert lied, that his affidavit is false, and that he had no role in the murder of Troy Wicker. This Court further finds that the evidence presented demonstrates that both Gilbert and Arthur engaged in an attempt to defraud this Court by means of *741 the affidavit made the subject of this Rule 32, in which Gilbert takes credit for the murder of Troy Wicker.
“Still, in the face of overwhelming evidence establishing Gilbert’s affidavit to be a fabrication, this Court ordered D.N.A. testing of the physical evidence at hand in this case, which Arthur alleged would identify Gilbert as the killer if Gilbert’s affidavit was in fact true. The D.N.A. testing confirmed this Court’s initial assessment of Mr. Gilbert’s credibility and proved that Gilbert’s affidavit was false. The report issued by the Alabama Department of Forensic Sciences indicated that Gilbert’s D.N.A. profile was not identified in any of the physical evidence tested and completely contradicts his statements made in his affidavit.
“In short, both factual testimony and science have exposed the affidavit of Mr. Gilbert to be a lie. The testimony presented during the evidentiary hearing and the forensic science report issued in this case establish both that Gilbert’s affidavit is false and that Gilbert lied to this Court. More importantly, this Court finds that the evidence also establishes that Arthur has participated in this attempt to perpetrate a fraud. Arthur is not entitled to any relief.”
(C.R. 79-87.)
In a proceeding for post-conviction relief pursuant to Rule 32, Ala. R.Crim. P.,
“[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.”
Rule 32.3, Ala. R.Crim. P. With regard to newly discovered evidence, Rule 32.1, Ala. R.Crim. P., provides, in pertinent part:
“Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:
[[Image here]]
“(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:
“(1) The facts relied upon were not known by the petitioner or the petitioner’s counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;
“(2) The facts are not merely cumulative to other facts that were known;
“(3) The facts do not merely amount to impeachment evidence;
“(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
“(5) The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that the petitioner received.”
Rule 32.1, Ala. R.Crim. P. Finally,
“[i]t is well-settled under Alabama law that ‘[t]he granting or denying of a new trial on the basis of newly discovered evidence rests largely in the trial court’s discretion. Welch [v. Jones, 470 So.2d 1103 (Ala.1985) ]. The exercise of that discretion depends largely upon the credibility of the alleged new evidence. McDonald v. State, 451 So.2d 440 (Ala.Crim.App.1984).’ Hamm v. Hudson Industries, Inc., 507 So.2d 933, 935 (Ala.Civ.App.1986), rev’d, Ex parte Hamm, 507 So.2d 936 (Ala.1987). ‘The appellate courts look with disfavor on motions for *742 new trial based on newly discovered evidence and the decision of the trial court will not be disturbed absent abuse of discretion.’ Sexton v. State, 529 So.2d 1041, 1052-53 (Ala.Crim.App.1988) (citations omitted). In Hope v. State, 521 So.2d 1383 (Ala.Crim.App.1988), this Court affirmed the trial court’s judgment denying the appellant’s Rule 20 petition based on newly discovered evidence, where the trial court did not find the witnesses presenting the new evidence to be credible. This Court, per Judge Bowen, held as follows:
“ ‘Here there is no evidence that the trial judge abused his discretion in denying a new trial on the grounds of newly discovered evidence based on the lack of credibility of the witnesses presenting the new evidence. Williams v. State, 489 So.2d 4, 5-6 (Ala.Cr.App.1986). “One condition of the trial court’s granting a new trial on the basis of newly discovered evidence is that the court must believe the evidence presented at the hearing.” McDonald v. State, 451 So.2d 440, 442 (Ala.Cr.App.1984).
“ ‘Since a coram nobis petition “serves as a motion for a new trial on the ground of newly discovered evidence[,]” Groce v. State, 48 Ala.App. 709, 711, 267 So.2d 499 (1972), there exists a presumption favoring the correctness of the trial court’s ruling on a petition for writ of error coram nobis. Brooks v. State, 248 Ala. 628, 631, 29 So.2d 4 (1947). “The granting of a motion for a new trial was addressed to the sound discretion of the trial court and will not be revised on appeal unless it clearly appears that the discretion has been abused.” Nichols v. State, 267 Ala. 217, 228, 100 So.2d 750 (1958). “The trial court is in the best position to determine the credibility of the new evidence.” Isom v. State, 497 So.2d 208, 212 (Ala.Cr.App.1986). “It is basic that in consideration of the sufficiency or insufficiency of the evidence to support the verdict, we cannot weight] the evidence or test the credibility of witnesses.” Walker v. United States, 301 F.2d 94, 95 (5th Cir.1962).’
“Id., at 1387-88.”
Johnson v. State, 564 So.2d 1019, 1022 (Ala.Crim.App.1989).
I.
The State argues that “[t]his case has been returned from remand to the Alabama Supreme Court and an appeal to the Court of Criminal Appeals is not necessary or appropriate.” (State’s brief at p. 52.) Specifically, it contends that, when it stayed Arthur’s execution on July 30, 2008, the Alabama Supreme Court, exercising its authority pursuant to Rule 8(d)(1), Ala. R.App. P., remanded the case for the circuit court to determine the credibility of Gilbert’s affidavit. Rule 8(d)(1), Ala. R.App. P., provides:
“When pronouncing a sentence of death, the trial court shall not set an execution date, but it may make such orders concerning the transfer of the inmate to the prison system as are necessary and proper. The supreme court shall at the appropriate time enter an order fixing a date of execution, not less than 30 days from the date of the order, and it may make other appropriate orders upon disposition of the appeal or other review. The supreme court order fixing the execution date shall constitute the execution warrant.”
The State also argues that, now that the circuit court has made its • determination, the case has been returned to the Alabama Supreme Court and that “there is no need for a full round of state court appeals.” (State’s brief at p. 53.) Therefore, it con- *743 eludes that this court does not have jurisdiction to hear this appeal.
Arthur argues that Alabama procedural rules set forth a well-defined procedure governing the filing of a Rule 32 and an appeal therefrom. He also argues that the plain language of the Alabama Supreme Court’s order did not show an intent to vary from the established procedure for handling appeals from Rule 32 proceedings. Arthur further argues that, if the Alabama Supreme Court exercised jurisdiction over this appeal, it would be “functionally similar to treating [his] Rule 32 petition as an original petition,” which the Alabama Supreme Court usually does only when there are extenuating circumstances. (Arthur’s reply brief at p. 7.) Finally, he argues that Rule 8(d)(1), Ala. R.App. P., “deals with stays of execution and in no way strips this Court of jurisdiction over [his] appeal.” (Arthur’s reply brief at p. 8.)
After the Alabama Supreme Court stayed Arthur’s execution, the State filed an application for a rehearing and a renewed motion to set an execution date. When the Alabama Supreme Court denied those motions, it specifically noted that Arthur’s Rule 32 petition was still pending in the circuit court. Also, the Alabama Supreme Court did not specifically order that the case be returned to that court after the circuit court ruled on the Rule 32 petition. Cf. Ex parte Jackson, 836 So.2d 973, 976 (Ala.2001) (“This cause is remanded with instructions for the Court of Criminal Appeals to remand the case for a hearing in the trial court to determine the admissibility of Jackson’s extrajudicial statement, in accordance with this opinion. After the trial court makes its return to the Court of Criminal Appeals, that court shall forward that return to this Court.”); Ex parte Pierce, 851 So.2d 606, 617 (Ala.2000) (“For these reasons, we remand this ease for the Court of Criminal Appeals to remand to the trial court for an evidentia-ry hearing on the question whether Pierce’s claim could have been raised at trial or on appeal and is thus barred pursuant to Rule 32.2(a)(3) or (a)(5). The trial court shall file a return to the remand within 60 days; the return shall include a transcript of the proceedings conducted and the trial court’s findings of fact and conclusions of law. The Court of Criminal Appeals shall transmit that return to this Court.”) (Emphasis added.) Therefore, pursuant to established procedure for handling appeals from judgments on Rule 32 petitions, we conclude that we do have jurisdiction to consider this appeal, and we address Arthur’s arguments.
II.
Arthur argues that the circuit court erred in concluding that the DNA test results, which showed that semen found in Judy Wicker’s underwear and jeans matched only her husband Troy, proved that Gilbert’s confession was false. Specifically, he contends that the DNA testing showed that Judy had sex with Troy some time before the murder, but that it was not probative as to whether she had sex with Gilbert after the murder. Arthur asserts that the circuit court mistakenly assumed that, if Gilbert had sex with Judy, his semen would have been on her clothing. However, he points out that the evidence does not establish that she put her panties and jeans on after she engaged in sexual intercourse after the murder. Finally, he argues that the only evidence to the contrary came from Judy, whom he describes as “a convicted murdered and admitted perjurer.” (Arthur’s brief at p. 39.)
The State argues that there was non-DNA evidence as well as DNA evidence, as set forth specifically in the circuit court’s order, that showed that Gilbert’s affidavit was false and fraudulent. It also argues that the circuit court specifically *744 found that what Judy was wearing when law enforcement officers entered the house was irrelevant. Finally, it asserts that, when the clothes that were collected after the murder were tested after one of the evidentiary hearings, they were found to contain Troy’s DNA and not Gilbert’s, which was consistent with Judy’s testimony.
With regard to this claim, the circuit court found:
“I. ARTHUR IS NOT ENTITLED TO ANY RELIEF ON HIS CLAIM THAT GILBERT’S CONFESSION REQUIRES THAT HIS CONVICTION AND SENTENCE OF DEATH SHOULD BE VACATED.
“In paragraphs 3ÍM9 of his amended successive Rule 32 petition, Arthur claims that he is entitled to relief based on the newly discovered evidence that Gilbert confessed to killing Troy Wicker. For several reasons noted below, this Court finds that not only has Arthur failed to meet his burden of proof of demonstrating that Gilbert’s affidavit and ‘confession’ establishes newly discovered evidence that he is innocent of the crime for which he was convicted and sentenced to death, but that, in fact, the evidence establishes that Gilbert’s affidavit is patently false.
“First, Arthur failed to present any credible evidence to substantiate Gilbert’s claims in his affidavit. Gilbert testified during the evidentiary hearing conducted on April 14, 2009, and maintained what he stated in his affidavit was true. However, although Gilbert claimed in his affidavit to have told several people that he killed Troy Wicker and further claimed that T am no longer afraid [of prosecution] since the U.S. Supreme Court ruled that a minor cannot receive the death penalty’, Gilbert refused to answer any questions or verify any statements in his affidavit concerning specific facts of his alleged involvement in the killing of Troy Wicker. This fact alone casts serious doubts on the credibility of Gilbert’s claims.
“Arthur also presented the testimony of two inmates, Steve Murphy and Charles Hastings, who both testified that Gilbert told them that he committed the murder for which Arthur was scheduled to be executed. However, this Court gives little weight to the testimony presented by Murphy and Hastings. Both are presently serving sentences of life without parole for committing a variety of violent offenses. In fact, Hastings is serving eight life sentences, three life without parole sentences, plus forty five years. (R. 96) Both Murphy and Hastings were friends and acquaintances of Gilbert. Murphy lived in the cell next to Gilbert in 2006, at the time Gilbert supposedly relayed this information. (R. 96) Hastings, who knew Gilbert from as far back as 1984, also was housed in a cell directly underneath Gilbert in Holman Prison in 2006-07. (R. 81-82) Even assuming that Murphy and Hastings testified truthfully, the fact that Gilbert told two of his friends serving life without parole sentences that he supposedly murdered Troy Wicker is particularly unconvincing as support for Gilbert’s affidavit. Essentially, the only support for Arthur’s claim that Gilbert committed the murder of Troy Wicker is limited to Gilbert’s affidavit itself. Arthur failed to present any other evidence that would give this affidavit a shred of credibility.
“Furthermore, this Court finds that the State presented overwhelming evidence that Gilbert’s affidavit is false and that Gilbert and Arthur conspired to fabricate the affidavit. First, the State presented the testimony of Judy Wicker, who was convicted of murder for con *745 spiring with Arthur to kill her husband, Troy Wicker. Judy Wicker’s testimony directly contradicts virtually all of Gilbert’s claims in his affidavit. Judy Wicker emphatically stated that she hired Arthur, not Gilbert, to murder her husband. (R. 310) Judy Wicker also testified that it was Arthur, not Gilbert, who killed Wicker and that she had knowledge of this because she was present when Arthur shot Troy Wicker. (R. 310) Finally, Judy Wicker stated that she did not know, and had never known, Gilbert and that she never had sex with Gilbert. (R. 309) This court considers Judy Wicker’s testimony at the Rule 32 hearing in April to be extremely important. In reference to the rape kit and any D.N.A., she testified that ‘what they found’ was ‘Troy’s’ before she or any one knew of either the presence of the semen on her panties or jeans or that science would prove it was Troy’s as she testified and not Gilbert’s as set forth in his affidavit. (R. 324) Judy Wicker’s testimony at Mr. Arthur’s trial was corroborated by at least twelve witnesses who gave significant testimony linking Arthur to the murder of Troy Wicker and now science has corroborated her testimony in this court.
“The State also presented the testimony of Doug Aycock, the former Chief of the Sheffield Police Department and Robert Hall, Chief Detective of the Muscle Shoals Police Department, who was the lead investigator in the murder of Troy Wicker. Both Aycock and Hall testified that they never heard the name of Bobby Gilbert during the investigation of the Wicker murder, that no witness mentioned Gilbert’s name and that no physical evidence in the case linked them to a person named Bobby Gilbert. (R. 238-39, 255-56) Hall further testified that he talked with Judy Wicker throughout the investigation and she never once mentioned the name Bobby Gilbert. (R. 256) Despite this being a twenty seven year old case, both Aycock and Hall still recalled several facts discovered during the course of their investigation that led them to develop Thomas Arthur, not Gilbert, as the suspect in this case. (R. 237-38, 253-55) Again, the great weight of the evidence at the Arthur trial completely contradicts the facts in the Gilbert affidavit.
“The State also presented numerous instances of lies within Gilbert’s affidavit. For instance, in his affidavit, Gilbert claimed that he was 17 at the time he had a sexual relationship with Judy Wicker and murdered Troy Wicker. Bill Summers, an Investigator with the Attorney General’s Office, testified that he obtained Gilbert’s personal information from the Department of Corrections and obtained a copy of Gilbert’s birth certificate from the Alabama Center for Health Statistics. Based on Gilbert’s birth certificate, Summers testified that Gilbert’s birthday was September 5, 1966, and that Gilbert would have been 15 in 1982 at the time Troy Wicker was murdered. (R. 273) This evidence conflicts squarely with Gilbert’s claim in his affidavit.
“Gilbert also claimed in his affidavit that in September of 2007, he told Jesse Bishop, a correctional officer at Holman Prison that the State was making a mistake executing Tommy Arthur. Contrary to Gilbert’s claims, Warden Bishop testified during the evidentiary hearing that Gilbert’s statement was not true and that he never had a conversation with Gilbert about Tommy Arthur. (R. 161-62)
“This Court finds particularly convincing the evidence presented by the State that Arthur participated in the creation of Gilbert’s affidavit by feeding information to Gilbert about the murder of Troy Wicker. The State presented testimony *746 that both Arthur and Gilbert were incarcerated in Holman Prison from September 2002 to January of 2008. (R. 172) Inmate Brian Barnes testified that he was incarcerated at Holman Prison from 2005-2006 in the cell next to Gilbert. (R. 132-33) During this time, Gilbert told Barnes that Gilbert was going to say that he committed the murder for which Arthur was convicted to get Arthur off of death row. (R. 133) Barnes said that Gilbert told him that Gilbert would falsely claim credit for the Wicker murder because he would be able to be on death row with his own individual prison cell and watch TV. (R. 133) Barnes also stated that Gilbert claimed he was going to get paid and that someone who ‘had done him wrong’ would be killed in Albertville in exchange for him taking the blame. (R. 134) Finally, Barnes testified that Gilbert received information about the facts of the case by passing notes directly from Arthur and that Barnes personally passed notes from Arthur to Gilbert as a hall runner. (R. 136-38) Gilbert denied having any contact whatsoever with Arthur. (R. 63-64)
“Similar to Barnes’s testimony, another inmate, Jeffrey Holmes testified for the State that he was a hall runner in Holman Prison from 2005-2006. (R. 275-76) Holmes testified that he passed notes between Gilbert and Arthur concerning Arthur’s case. (R. 276-77) Holmes also stated that Gilbert said he was going to claim that he committed the murder for which Arthur was convicted. (R. 277) Holmes testified that Gilbert said that Arthur’s daughter was going to take care of Gilbert for taking the blame for the murder. (R. 279)
“This Court finds great credibility in the testimony of the inmate witnesses provided by the State. This testimony directly contradicted Gilbert’s claims that he never communicated with Arthur and never made a deal with Arthur to take the blame for the murder of Troy Wicker. (R. 63-64) Both Barnes and Holmes were offered nothing by the State for their testimony and contacted the State with their information on their own will. Both men had absolutely nothing to gain from testifying during the evidentiary hearing. To the contrary, as the testimony during the hearing indicated, Barnes and Holmes had plenty to lose from testifying in this case and each man fears for his safety for exposing the conspiracy between Gilbert and Arthur. (R. 137, 283) Barnes testified that he was stabbed by another inmate the week before the April hearing and had to be transferred to Draper [Correctional Facility]. (R. 132)
“Finally, this Court finds that the testimony of Correctional Officer Captain Richard Carter provided other evidence of impeachment as to Mr. Gilbert’s credibility. During the evidentiary hearing, Gilbert claimed that his fiancée was banned from visiting him in prison in retaliation for confessing to the murder of Troy Wicker in Gilbert’s affidavit. (R. 25) However, testimony from Captain Carter refuted Gilbert’s claims and demonstrated that Gilbert’s visitation privileges were revoked because he was found to be in the possession of contraband, which was supplied by his fiancée. Captain Carter testified that he works at St. Clair Correctional Facility where Gilbert is currently incarcerated. Captain Carter testified that Gilbert was found in possession of a cell phone, which is considered to be contraband, that contained text messages from and pornographic pictures of Gilbert’s fian-cée. (R. 195-96) As a result of this violation, in accordance with the Department of Correction’s policies, Gilbert’s visitation privileges were revoked. (R. 189)
*747 “Captain Carter then testified that Gilbert stated that he would recant his affidavit and testimony in the Arthur case if his fiancée’s visitation privileges were restored. (R. 190) Gilbert’s attempt to disavow a sworn affidavit made the basis of this Rule B2, which in effect stayed an execution, is extremely relevant to this Court’s assessment of Mr. Gilbert’s credibility. This Court finds Mr. Gilbert and his affidavit to be incredible.
“Finally, and most importantly, this Court finds that the D.N.A. analysis conducted by Angelo Delia Manna of the Alabama Department of Forensic Sciences confirms that Gilbert’s affidavit is false and that Gilbert and Arthur attempted to perpetrate a fraud on this Court. In both his July 9, 2009, report and in his testimony during the August 10, 2009, hearing, Delia Manna stated that he conducted D.N.A. testing on the available physical evidence which was introduced as evidence in Arthur’s third trial, including: the wig, the blouse, panties and jeans recovered from Judy Wicker at the time of the murder, and a pillowcase identified to be under the head of Troy Wicker.
“This evidence was then compared to the D.N.A. profile of Bobby Ray Gilbert. None of the D.N.A. obtained from this evidence matched Gilbert’s profile. This finding alone refutes Arthur’s claim that D.N.A. testing could confirm the veracity of Gilbert’s claim in his affidavit that he killed Troy Wicker. To the contrary, science has proved Gilbert’s affidavit to be false.
“Gilbert’s claim that he had sex with Judy Wicker immediately after the murder of Troy Wicker was false. Instead, the report indicated that the semen found on Judy Wicker’s underwear and jeans, never before tested until this Court’s order, but collected from the area where Gilbert alleges he had sex with Judy Wicker and then made it look like she had been beaten up, matched the D.N.A. profile of the blood on the pillowcase, which presumably is the D.N.A. of Mrs. Wicker’s dead husband, Troy Wicker. (R. 435) During testing, the presence of semen was detected on the inside of Judy Wicker’s panties and pants and was found to be a mixture of two individuals: one male and one female. Delia Manna further found that the genetic donor of the bloodstains on Judy Wicker’s shirt and the genetic donor of the bloodstains found on the pillowcase under the head of Troy Wicker were these two individuals. (Court’s Exhibit 3) In short, the semen mixture identified on Judy Wicker’s clothes, torn, and collected from the den by Gary Wallace with ADFS, is consistent with her having sex with her husband at some time in close proximity of the murder and her false allegation of rape, and not with Gilbert. While testimony from an Officer Lang at Judy Wicker’s trial, was introduced by the Petitioner at the August 10th hearing to show that he testified that Judy Wicker was found in the den in a robe, the Court finds this evidence to be of little significance, especially in light of the following evidence presented in the trial of Thomas Arthur.
“Officer Lang testified at Arthur’s trial that he had seen Judy Wicker twice on the morning of the murder wearing the pink blouse, later found blood stained and collected from the den where the panties and jeans were collected. He stated that when he found her in the den she was covered up and not sure what she was wearing. (R. Arthur trial at 341, 342, 345) Gary Wallace, ADFS and at the time director at the Florence lab, testified that he processed the scene, after Judy had been taken to the hospital by ambulance. He is the one who collected these three *748 items in question marked Exhibits 17, 18, and 19 at trial, from the den area next to the very hallway that Gilbert references in the affidavit. (R. 365, 366) No other clothes or items were taken as evidence by him from this den ai'ea. Gilbert did not mention anything about Judy Wicker changing clothes after having sex with him in the hallway where he says he beat her up before she was found lying in the nearby den when her sister and police found her beaten and alleging rape. Officer Lannie Coan with Muscle Shoals [Police Department] testified at Arthur’s second trial that when he got there the house had been ransacked. Wicker was lying on the den floor with her sister Theresa, Wicker was crying and appeared to have been beaten. He testified her clothes had been ripped. (R. 1169) This is consistent with the way in which Delia Manna received the panties at the lab. There is abundant evidence to establish that Judy Wicker and Thomas Arthur attempted to set up a false scenario that the murder had occurred during a rape/robbery by an unidentified black man. The presence of semen was important to confirm a rape, as Gilbert’s affidavit sets forth. Now the evidence that the semen source is not Gilbert, but Troy Wicker, disproves his affidavit completely. It is irrelevant what clothes Judy Wicker had on at the time the officer arrived on the scene or how they were removed from her and by whom. The issue is that these clothes relevant to the murder and alleged rape collected in the den where Judy Wicker was found injured immediately after the murder and alleged sex with Gilbert did not contain his semen but, Troy Wicker’s instead. Just as Judy Wicker testified, ‘it was Troy’s’, not Gilbert’s and the physical evidence confirms the affidavit to be false. (R. 324)
“These findings directly contradict Gilbert’s claim in his affidavit that he had unprotected sex with Judy Wicker immediately after the murder of Troy Wicker. Delia Manna testified that when two people have sex, it would be expected that fluids containing genetic traits from both the male and female would be present in the pelvic and vaginal areas of the female. Thus, this genetic material could be transferred to the female’s clothing. However, Gilbert’s D.N.A. profile was not identified in the semen mixture detected on Wicker’s clothing. This Court places great weight on the lack of any genetic evidence linking Gilbert to having sex with Judy Wicker. This evidence is certainly the very next best evidence of who and who not Judy Wicker had sex with close in time to the murder of her husband and prior to going to the hospital for treatment when the rape kit examination took place. Coupled with the scientific evidence that proves Judy Wicker had sex with Troy Wicker, this evidence confirms Judy Wicker’s testimony and wholly contradicts the allegations asserted in Gilbert’s affidavit.
“The D.N.A. testing in this case failed to link Gilbert to the murder of Troy Wicker in any fashion. The D.N.A. testing, in fact, proves that Gilbert lied in his affidavit. This strong evidence, along with the testimony presented during the evidentiary hearing that Gilbert and Arthur conspired to create a fabricated affidavit, establishes that both Gilbert and Arthur have defrauded this Court. Because Gilbert’s allegation that he committed the murder of Troy Wicker has been established to be patently false, this Court finds that Gilbert’s affidavit would have not have changed the result of Arthur’s trial and does not constitute newly discovered evidence under Ala. R.Crim. P. 32.1(e). Arthur’s *749 claims that he is actually innocent and that his conviction and sentence of death should be vacated are utterly without merit and are accordingly denied.”
(C.R, 87-101.)
As the State correctly points out, there was ample non-DNA evidence to support the circuit court’s finding that Gilbert’s affidavit was not credible and that, therefore, it did not constitute newly discovered evidence. Nevertheless, out of an abundance of caution, the circuit court ordered some DNA testing to further test the credibility of Gilbert’s affidavit. It then found that that testing provided further support for its finding that Gilbert’s affidavit was not credible. In fact, in its order denying the petition, the circuit court specifically concluded:
“This Court finds that the evidence presented during the evidentiary hearings, including evidence obtained through the use of scientific testing, as well as the testimony presented at the trial of Tommy Arthur, overwhelmingly prove that Gilbert’s claim that he committed the murder of Troy Wicker is false and his affidavit a fraud perpetrated by Gilbert and the Petitioner upon this court.”
(C.R. 114.) The record supports the circuit court’s findings, and we will not second-guess them. Therefore, Arthur’s argument to the contrary is without merit, and he is not entitled to relief on this ground.
III.
Arthur also argues that “[t]he circuit court erred in not ordering further DNA testing.” (Arthur’s brief at p. 40.) Specifically, he contends that the circuit court found that DNA testing of the wig would assist in determining Gilbert’s credibility, but that the testing it ordered was not sufficient to develop a profile. Arthur asserts that he showed good cause for further DNA testing of the wig because it is allegedly undisputed that the perpetrator wore the wig and that there is genetic material on the wig. He also asserts that more sensitive DNA testing of the wig is possible and could be performed at his expense.
The State argues that Delia Manna testified that there was not a need for further testing because there was not any DNA found on the wig. It also argues that Delia Manna testified that the testing Arthur now seeks is different, but that it is not more sensitive or sophisticated, and that it is not appropriate to use in this case.
In its order denying the petition, the circuit court made the following findings regarding this claim:
“III. ARTHUR IS NOT ENTITLED TO RELIEF ON HIS CLAIM THAT THIS COURT SHOULD GRANT ACCESS TO DNA EVIDENCE AND ORDER DISCOVERY RELATING TO THE CLAIM THAT THE RAPE KIT CANNOT BE LOCATED.
“In paragraphs 65-68 of his amended successive Rule 32 Petition, Arthur seeks this Court to order DNA testing on physical evidence — including the rape kit, wig, bloodstained and torn clothing and hairs....
“Arthur is not entitled to relief on this claim. No further discovery is warranted in this case. In this Rule 32 proceeding, Arthur would be entitled to discovery only if he demonstrated good cause for the requested discovery. See Ex parte Land,, 775 So.2d 847, 852 (Ala.2000). ‘The Alabama Supreme Court in Land noted that the main emphasis in determining whether good cause is shown is a determination of the merits and the procedural posture of the underlying claims for which the discovery is sought to substantiate.’ Ex parte [State (In re State v.) Stallworth), 941 So.2d *750 327, 331 (Ala.Crim.App.2006); see also Ex parte Perkins, 920 So.2d 599, 603 (Ala.Crim.App.2005) (‘To determine whether a petitioner has established good cause we must examine the elements of the claim for which the discovery is requested.’).
“Arthur cannot demonstrate good cause for discovery. As noted above, the focal point of Arthur’s amended successive Rule 32 petition is based on the affidavit of Bobby Gilbert. After the evidentiary hearing of April 14-15, 2009, this Court noted that Gilbert’s credibility was extremely suspect and that Arthur’s Rule 32 petition could have been dismissed at that time for failing to meet his burden of proof. However, out of an abundance of caution, this Court ordered the D.N.A. testing of the wig, clothing and any items retained by the Huntsville DFS lab as relevant to Gilbert’s credibility only.
“Although not entitled to it, according to the Alabama Supreme Court and the Federal District Courts previously cited as well as Eleventh Circuit, Arthur received his D.N.A. testing on the basis of this Gilbert affidavit only. The results of the D.N.A. testing did not support Arthur’s claims, but disproved them. Specifically, this Court places great weight in the Department of Forensic Sciences’ report which detected the profiles of Troy and Judy Wicker in the semen mixture on Judy Wicker’s panties and pants. As noted above, this Court finds that the Forensic Sciences’ D.N.A. report demonstrates Gilbert lied in his affidavit about having sex with Judy Wicker and further demonstrates that Gilbert’s entire affidavit is a fraud. Further D.N.A. testing in this case is not warranted and is denied.
“This Court specifically denies Arthur’s continuing request for further D.N.A. testing on the wig. In fact, initially this same wig was analyzed by the Alabama Department of Forensic Sciences and scrapings from the wig were preserved. No request was ever made for further examination of the wig and there were not hairs found inside the wig for testing. Mr. Angelo Delia Manna testified that because one’s head hairs insulate the scalp or skin cells from the wig’s interior surface that the likelihood in this case of ever recovering a DNA profile were minimal. (R. 349) Therefore, such discovery is unnecessary and is without good cause. In his report, Angelo Delia Manna stated that he was unable to obtain any D.N.A. profile, let alone Gilbert’s, from the wig. Delia Manna testified during the August evidentiary hearing that he used the most sensitive equipment and procedures available to maximize the possibility of obtaining a D.N.A. profile, but that he was not able to obtain a D.N.A. profile from the wig. Even before his testing, Delia Manna testified during the April evidentiary hearing that it would be very possible that no D.N.A. profile would be found on the wig because of possible contamination and also based on the possibility that no D.N.A. profile could have been left on the wig. It has been scraped, tested, handled, worn, and contaminated as it has been stored from trial to trial for over 27 years. (R. 553) This Court notes that Mr. Delia Manna is an accredited forensic scientist and D.N.A. analyst who sits on the F.B.I. oversight board for D.N.A. research and that Mr. Delia Manna’s lab is accredited by the American Society of Crime Lab Directors. His professional qualifications are beyond reproach. He is among the very best in his field of expertise. (R. 492) This Court specifically finds that the Alabama Department of Forensic Sciences’ work in this case, particularly the analysis of Mr. Delia Manna, has been exemplary. This *751 Court finds no reason to call the D.N.A. report in this case into question. In fact the Petitioner offered no evidence to discredit or undermine the D.N.A. analysis results in this Rule 32 hearing or the validity of the testing performed.
“More importantly, Arthur has failed to demonstrate good cause for additional D.N.A. testing of the wig because his underlying claim supporting the testing — that Gilbert committed the murder — has been proven completely false. The issue before this Court, and the purpose for this Court’s initial order requiring D.N.A. testing of the physical evidence, was a narrow one: to determine whether Gilbert’s affidavit was credible to support Arthur’s claims that newly discovered evidence establishes that he was unconstitutionally convicted and sentenced for a murder he did not commit. Gilbert’s affidavit and Arthur’s claims in his amended successive Rule 32 petition have been proven false and therefore, there is no viable claim through which further discovery may be granted.”
(C.R. 108-13.) The record supports the circuit court’s findings, and we will not second-guess them. Therefore, Arthur is not entitled to additional DNA testing.
IV.
Arthur further argues that the State has engaged in a course of conduct that has prevented him from obtaining DNA testing of Judy’s rape kit and that, therefore, sanctions are warranted. Specifically, he contends that he has repeatedly sought DNA testing of the rape kit since 2002 and that the State has opposed his requests, but that the State has never admitted that the rape kit had been destroyed. Rather, Arthur asserts that the State waited until July 30, 2008, one day before he was scheduled to be executed, to admit that the rape kit could not be located.
Arthur argues that “[ejxecuting [him] after destroying or losing crucial evidence violates contemporary standards of decency.” (Arthur’s brief at p. 47.) He supports his argument with an assertion that 47 states, including Alabama, have enacted post-conviction DNA access statutes and a reference to opinion polls. Arthur further argues that “the State’s spoliation of crucial evidence that could establish his factual innocence requires that he be spared from death.” (Arthur’s brief at p. 50.) Finally, he argues that his present inability to test the rape kit makes executing him cruel and unusual punishment and a violation of due process.
The State argues that there is not a right to obtain post-conviction access to the State’s evidence for DNA testing. It also argues that Arthur has known about the existence of the rape kit since 1982, that the rape kit was not used as evidence during Arthur’s trials or during Judy’s trial, and that Arthur did not even request access to the rape kit until 2002. Therefore, it argues that Arthur cannot succeed on a claim that the rape kit constitutes newly discovered evidence.
The State also argues that the circuit court specifically found that the results of any testing on the rape kit would not have been favorable to Arthur. Finally, it argues that the circuit court specifically found that the maintenance of rape kit was proper and consistent with policies and procedures that were in effect at the time.
In its order denying the petition, the circuit court made the following findings regarding this claim:
“II. ARTHUR IS NOT ENTITLED TO ANY RELIEF ON HIS CLAIM THAT THE FAILURE TO PRESERVE THE RAPE KIT REQUIRES THAT HIS CONVICTION AND SENTENCE OF DEATH BE VACATED.
*752 “In paragraphs 50-64 of his amended successive Rule 32 petition, Arthur alleges that the fact that the rape kit performed on Judy Wicker at the time of the murder cannot be located entitles him to relief. Arthur contends that this fact constitutes newly discovered evidence of a Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ].
“During the evidentiary hearing, this Court expressly denied relief on this claim and reiterates its ruling in this order. Arthur’s claim is without merit and he is not entitled to relief. Arthur’s claim concerning the rape kit does not even fall under the Brady rule. As the State has noted, Brady is triggered, by ‘the discovery, after trial, of information favorable to the accused that had been known [before or during trial] to the prosecution but unknown to the defense.’ United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381 (1985); accord United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397 (1976) (same). Furthermore, as the United States Supreme Court has recently held, ‘Brady is the wrong framework’ to analyze the disclosure of evidence in the post conviction context. District Attorney’s Office for the Third Judicial District v. Osborne, 129 S.Ct. 2308, 2320 (U.S.2009).
“However, it is clear that Arthur had knowledge of the existence of this rape kit for over twenty seven years. As a letter from the Department of Forensic Sciences, included as an exhibit in Arthur’s successive Rule 32 petition, indicates the fact that a rape kit was performed on Judy Wicker was known as far back as March of 1982. (See Exhibit 2 to Arthur’s Successive Rule 32 petition.) This evidence was known and made available to Arthur. This Court finds it extremely important that neither the State nor the defense introduced the rape kit as evidence in Arthur’s trials, nor was the rape kit introduced in Judy Wicker’s trial. In fact, Arthur did not even begin to request access to the rape kit until sometime in 2002, years after his conviction and sentence were affirmed on appeal.
“Nor does the fact that the rape kit performed on Judy Wicker is no longer available constitute a newly discovered Brady violation. This fact would not have changed the result of Arthur’s trial. No evidence was presented to this Court that the State failed to make the results of the rape kit available to Arthur at the time of his trial. Arthur simply chose not to utilize this evidence during his trials. The State had no duty to preserve evidence collected in this case that was not used or admitted in any trial, years after Arthur’s trials were completed.
“This Court further finds that there is no evidence of bad faith on the part of any law enforcement agency for intentionally destroying the rape kit, with knowledge that it would be exculpatory for Arthur, for the purpose of preventing its use by Arthur in a criminal proceeding. In fact, even if the rape kit was currently available, this Court finds that based on the evidence presented during this proceeding, the results of any D.N.A. testing performed on the rape kit would not have been favorable to Arthur. Presumably, any D.N.A. testing performed on the rape kit, which was taken from Judy Wicker shortly after the murder, would have simply corroborated the results of Angelo Delia Manna’s analysis of the semen mixture found on Judy Wicker’s panties and pants which were also recovered from Judy Wicker by law enforcement a short time after the murder. The report of Angelo Delia Manna indicates that the panties he received from the court clerk *753 were received with ‘defects (cut/tear) present along the right outseam and leg opening, and extend across the front of the crotch, and are consistent with the garment being cut off of the wearer’, or torn, which is consistent with the testimony of Officer Coan on the scene, and of Mr. Wallace who collected these panties in the course of investigating an alleged rape/murder. (R. 1169 Arthur second trial) Had Judy Wicker been wearing other panties at the hospital they would have been collected for testing, but because they are not listed on the rape kit inventory and forensics report, the evidence convinces this Court she was not wearing any, which explains why these panties found in the den were never tested.
“Now pursuant to this Court’s order Ms. Wicker’s clothing has been tested and the analysis in this case provides the next best evidence of what the rape kit analysis would have shown years ago. (See Court’s Exhibit 3) Any potential testing of the rape kit would have simply confirmed that Judy Wicker had sex with Troy Wicker, and not Bobby Gilbert. (Court’s Exhibit 3) Accordingly, because the results of the rape kit were known to Arthur at the time of his trial and because the availability of the rape kit would not have altered the result of his trial or established his innocence, Arthur has failed to meet his burden of proof of demonstrating that these facts constitute newly discovered evidence under Ala. R.Crim. P. 32.1(e).
“Furthermore, this Court finds the State of Alabama’s maintenance of the rape kit performed on Judy Wicker at the time of the murder was entirely proper and consistent with policies and procedures in effect at that time. During the evidentiary hearing, Angelo Delia Manna, chief of forensic biology and D.N.A. for the Alabama Department of Forensic Sciences (‘DFS’) testified concerning his review of DFS documents relating to the location of the rape kit. First, Delia Manna testified that, in 1982, after DFS had completed analysis and testing on physical evidence, the local law enforcement agency who provided the physical evidence for testing would be contacted to determine whether that agency wanted the physical evidence returned to the agency or destroyed by DFS. (R. 34(M1)
“In this ease, Delia Manna testified that the rape kit, including other physical evidence, was submitted to the Florence DFS lab on February 1, 1982. (R. 338) The rape kit was then transferred to the Huntsville DFS lab for forensic testing. Id. After testing was completed in March of 1982, the rape kit and other physical evidence were returned to the Florence DFS lab in July of 1982. (R. 338-39) Subsequent to the return to Florence, Delia Manna testified that the documentation indicated that District Attorney James Patton instructed the Florence DFS lab to destroy all physical evidence that was originally submitted to the Florence DFS lab on February 1, 1982, of which the rape kit was included. (R. 339) Delia Manna testified that Patton’s request was an open-ended request; because of space limitations on the document, Patton simply referenced all of the physical evidence from the February 1, 1982 submission to the Florence DFS as ‘et cetera’ that should be destroyed. (R. 340) Delia Manna testified that this specific sequence of events concerning the rape kit was typical of the procedures in place at the time between DFS and other law enforcement agencies. Finally, Delia Manna testified that he oversaw a search of the Florence and Huntsville DFS labs and that neither facility had a rape kit in their possession pertaining to this case.
*754 “Based on this evidence, this Court finds that the possession, testing, maintenance and destruction of the rape kit were entirely proper. In accordance with its practices in effect at that time, after testing was completed on the rape kit, the Department of Forensic Sciences contacted the law enforcement prosecuting agency to determine what should be done with that evidence. At that time, James Fatten, District Attorney of Colbert County, made a determination that the rape kit, along with other physical evidence, was not relevant to the prosecution of this case and ordered that evidence destroyed in accordance with the practices in place at that time. This Court finds that no agency engaged in negligent or improper conduct and this Court further finds no error in the testing or maintenance of the rape kit performed on Judy Wicker in this case. This court also considers the affidavits submitted by the Court reporter, the District Attorney and the Circuit Clerk of Colbert County, who have conducted a through search for any evidence collected in this 27 year old case and find no additional evidence exists. (Court’s Exhibit 4) Arthur is not entitled to any relief on his claim that the unavailability of the rape kit requires his conviction and sentence to be vacated.
“Accordingly, this Court denies relief on this claim.”
(C.R. 101-08.) The record supports the circuit court’s findings in this regard, and we will not second-guess them. Therefore, Arthur is not entitled to relief on this ground.
V.
Finally, Arthur argues that he “has not been allowed appropriate discovery on this issue to determine whether the rape kit in actuality still exists or whether, if the rape kit was destroyed, its destruction was in bad faith.” (Arthur’s brief at p. 52.) In support of his argument, he contends that the State made only minimal efforts to search for the rape kit and that his expert testified that it was reasonable to believe the rape kit still existed. He also makes reference to other cases in which “lost” evidence has subsequently been found.
Arthur asserts that, “[t]hough the circuit court found that the rape kit had been destroyed according to routine procedures, in fact the only thing proved by the State’s evidence is that these routine procedures are woefully inadequate.” (Arthur’s brief at p. 56.) He also asserts that the State offered only unreliable evidence in support of its contention that the rape kit was destroyed. Arthur further asserts that it would have been fundamentally unfair for the State to destroy evidence that might prove his innocence and that, if the State did destroy it, he is entitled to discovery as to the circumstances of the destruction. Accordingly, he concludes that he is entitled to additional discovery regarding whether or not the rape kit still exists.
The State argues, as the circuit court found, that Arthur has not demonstrated that the unavailability of the rape kit constitutes newly discovered evidence and that he did not establish good cause for further discovery with regard to the unavailability of the rape kit.
Initially, we note that, during a hearing on April 14, 2009, Arthur’s counsel prefaced her argument and presentation with the statement that Arthur sought only limited relief. Specifically, she stated that he was seeking discovery with respect to DNA evidence, but that he was not seeking a new trial or release from prison. She also stated that, if Gilbert’s confession were true, then Arthur would be entitled to discovery with respect to DNA evidence. The State argued that the primary issue before the court was whether Gilbert’s confession was credible, and the cir *755 cuit court appeared to agree with that assessment.
Also, in its order denying the petition, the circuit court made the following findings regarding this claim:
“Arthur has failed to demonstrate good cause for further discovery to investigate the unavailability of the rape kit. As noted above, this Court has denied relief on Arthur’s claim that the unavailability of the rape kit constitutes newly discovered evidence that entitles him to relief. Therefore, further discovery is not warranted. Furthermore, this Court notes the three affidavits submitted by the State from Shelley Bishop, the court reporter for former Circuit Judge Pride Tompkins, Nancy Hearn, Circuit Clerk for the 31st Judicial Circuit, and Kyle Brown, Assistant District Attorney for the 31st Judicial Circuit (Colbert County) in which all three affi-ants declared that none of their respective offices maintained any evidence, including the rape kit, relating to the Tommy Arthur capital murder trials. (Court’s Exhibit 4) Further discovery at this point relating to either the wig or the location of the rape kit, is simply speculative, unnecessary, unwarranted and without good cause. This Court denies all relief on this claim.”
(C.R. 113-14.) The record supports the circuit court’s findings in this regard, and we will not second-guess them. During the proceedings below, the State specifically argued that Arthur’s previous requests for DNA testing based on the facts of this case had been denied. When it ordered DNA testing, the circuit court indicated that the purpose of that testing was to further test the credibility of Gilbert’s affidavit. The circuit court determined that it had sufficient evidence upon which to make its findings, and it set forth its findings regarding the credibility of Gilbert’s affidavit in great detail. Therefore, there is no need for further DNA testing, and Arthur is not entitled to any additional discovery or any other relief with regard to the rape kit.
The circuit court, which observed and, at times, questioned the witnesses, was in the best position to determine the credibility of the witnesses and their testimony. In its order denying the petition, it set forth in detail its reasons for making the credibility choices it made in determining that Arthur had not established that there was newly discovered evidence that would provide a basis for post-conviction relief. Based on our review of the record, we do not find that the circuit court exceeded its discretion in denying Arthur’s petition. Accordingly, we affirm the circuit court’s judgment.
AFFIRMED.
WELCH, KELLUM, and MAIN, JJ., concur.
WINDOM, J., recuses herself.